David Molitor v. BNSF Railroad 121-1486. Before you, you have Justice David Ellis, Justice James Fitzgerald Smith, and Justice Nathaniel House. Nathaniel House Our standard procedure is that we have the appellant go first for 10 or 15 minutes max. We do not interrupt unless, per chance, they get way off point and then we ask questions. After that, the appellee has their opportunity and then we ask questions and then there's the fair enough. Can your honors hear me? Yes. Yes. Yes. I always figured it's a good thing to ask at the beginning of these. May it please the court. My name is Jonathan Sternberg and I represent the appellant David Molitor. As your honors know, Mr. Molitor appeals from a summary judgment in favor of the BNSF Railway Company on his injury claim under the FELA. The trial court excluded his liability and causation experts, Drs. Perez and Scioto, holding their carcinogenic toxins during his railroad work and that this was a likely cause of the lymphoma he was later diagnosed with, was inadmissible under Rule 702 and the Frye Standard. And because Mr. Molitor then had no medical causation expert, the trial court granted the railroad summary judgment. Your honors, excluding the experts and therefore granting the railroad summary judgment was error. This court should reverse the trial court's judgment and remand this case for trial. The trial court fundamentally misapplied the liberal admission standards for expert testimony in Rule 702 and Frye and acted as the gatekeeper that this court and the Illinois Supreme Court repeatedly have held that in this realm, trial courts are not. It improperly turned issues of the weight of the expert testimony, which are properly redressable by vigorous advocacy and cross-examination into issues of its admissibility. Dr. Perez, the liability expert, not the medical expert, employed a historical exposure assessment, a methodology that is generally accepted in the scientific community and previously approved of, in fact, by Illinois courts for estimating historic toxic exposures that can't be directly measured. He did so to apply Mr. Molitor's work history to studies of exposure data and risk and therefore concluded that Mr. Molitor suffered a significant, and he called chronic, exposure to carcinogens during his railroad work, which was a foreseeable harm. Dr. Chiodo, the medical expert, then used Dr. Perez's report and his knowledge and experience of diesel exhaust causing lymphoma, as well as extrapolation, another methodology, from scientific studies about the association between exposures to diesel exhaust and herbicides and lymphoma, and that's another well-established, generally accepted scientific methodology that Illinois courts have previously approved of to conclude that Mr. Molitor's likely cause of his lymphoma. Your Honors, under Rule 702 in Illinois's Frey progeny, especially the Donaldson case from the Supreme Court in 2002, the law is and must be that these opinions are admissible and the trial court erred in holding otherwise. All of the trial court's concerns and the railroad's arguments in this case about the drawbacks or limitations of these experts' opinions go to the weight of their testimony, which is the sole province of the jury, not its admissibility. As this court previously held in the Noakes case in 2006, applying the Donaldson case so as to reverse the exclusion of expert causation testimony in an FELA case, these are all concerns that, quote, can be adequately brought to light before the jury on cross-examination. And Your Honors, that's the fulcrum here. Is this something that can be addressed on cross-examination? If so, then it's an issue of weight and not admissibility. Frey, the Frey test, is concerned solely with the general acceptance of new methodologies, ones that the Supreme Court in the Donaldson case called original or striking, not challenges to an expert's application of existing methodologies or the facts underlying the opinion, all of which go to weight and not admissibility, so long as the expert uses an existing methodology and can articulate the factual basis for his opinion, the testimony is admissible, and Frey simply doesn't apply. And that's exactly the case here. The trial court's only basis for rejecting the expert's opinions was Dr. Perez had relied on Mr. Molitor, the appellate's self-reporting and some work records, which it said was insufficient foundation. And it held Dr. Chiodo's testimony that his methodology was generally accepted was insufficient. Illinois courts resoundingly have rejected the trial court's basis as being reasons to exclude expert testimony, and I'd like to address this in three parts. First, the experts here were able to state the facts on which their opinions rely, which is all that's required because any limitations are subject to cross-examination, again the fulcrum. And in holding otherwise, the trial court relied on a prior test that had been abrogated in Donaldson and its progeny. Second, the expert's methodologies in concluding that Mr. Molitor had suffered a substantial exposure to carcinogens, that this violated the railroad standard of care, or that this was a likely cause of his lymphoma, were simply not new or novel. So FRI doesn't apply at all. And finally, a jury can rely reasonably on the expert's testimony in determining the railroad's liability in the causation of Mr. Molitor's lymphoma under the liberal causation standards of the FELA. So let's start with the trial court's rejection of the expert's opinions based on its holding that it, quote, must analyze the adequacy of their foundation. That's on page two of its opinion. The trial court held Dr. Perez's exposure opinion had to be rejected because it was based on an interview of Mr. Molitor, and therefore Dr. Chiodo couldn't rely on Dr. Perez's opinion either. In holding this, the trial court relied on the second district's prior decision in the Soto case in 2000, which relied on a prior fourth district case, Harris, to impose a, what it called a gatekeeper role for reliability. But later in the Decker case in 2000, and again in Donaldson in 2002, the Supreme Court rejected all of this. It abrogated what it called the FRI plus reliability test on which the trial court here was relying. And it held in Donaldson, quote, questions concerning underlying data go to the weight of the evidence rather than its admissibility. And then in Noakes in 2006, this court applied this same principle in reversing the exclusion of information used or not used by the expert was not a sufficient basis to bar as lacking foundation the expert's testimony. So instead, the only allowable question about the factual basis is whether there is one at all. As we show in our reply brief, pages eight to 13, where we go through all of the decisions the railroad cited for the contrary proposition. Only if the expert is totally unable to articulate a factual basis for his opinion, does that render it inadmissible under rule 702 because it's, as the court held in the Safford case, is not subject to scrutiny by meaningful cross-examination. And later, a panel of this court in which Justice Howes and Justice Ellis were on, in a case we cite in our reply brief, held that even that probably went too far. Regardless, the law is that if it's addressable by cross-examination, it's weight, not admissibility. So if the expert can articulate that factual basis, any challenges that the opponent may have, as the court held in Noakes, quote, would affect the weight of the evidence and the credibility of the experts rather than the admissibility of that testimony and can be adequately brought to light before the jury on cross-examination. Here, Dr. Perez began with Mr. Molitor's own statements about his work history, which it's well accepted that an expert can do. And we address that on page 19 of our reply brief, where there are a series of cases holding that experts can do that and the jury can take whether the self-reporting, you know, they can take that into consideration in the weight. He then, Dr. Perez then used 119 sources, including Mr. Molitor's work in medical records, scientific and railroad literature, air data from BNSF and other railroads, to reconstruct and quantify Mr. Molitor's exposures. The law of Illinois is that this is more than sufficient. As the court held in Noakes, any limitations by Dr. Perez, in part from using Mr. Molitor's self-reporting and not visiting a train yard, for example, as the trial court held in its opinion, quote, would affect the weight of the evidence and the credibility of Dr. Perez rather than the admissibility of that testimony, again, because the issue can be adequately brought to light before the jury on cross-examination. The trial court misapplied the law in rejecting the opinions based on foundation, and it's reversible for this reason alone. Next, the trial court also suggested that these experts' opinions recounting of their methodologies and how they're generally accepted was insufficient, and Mr. Molitor had to show something more, although it didn't identify what that was. This equally misapplied the law. First, this is on summary judgment, so any evidence in Mr. Molitor's favor has to be taken as true, and that's the Duran case from the second district the Supreme Court approved of in Donaldson. Regardless, the methodologies that the experts described using are clearly generally accepted under existing Illinois law and therefore don't implicate Fry. Instead, the Railroad's challenge is to how they apply to those methodologies, which, as the Supreme Court again held in Donaldson, doesn't fall under Fry and goes to weight, not admissibility. In Donaldson, the court said, once a principal technique or test has gained general acceptance, its general acceptance is established as a matter of law, and it means in prior cases, citing, of course, prior cases about the methodologies there. Dr. Perez's methodology here was this historical exposure assessment, and Dr. Chiodos was relying on existing medical knowledge, as well as extrapolating causation for this particular form of cancer from these particular carcinogens from other studies finding an association in that. Both of these methodologies have been approved of in prior litigation, so therefore their acceptance is established as a approved of both methodologies. They noted that historical exposure assessments are necessary in cases like this. Just remember, this is a case where Mr. Molitor had worked for the Railroad for many years, has been retired for quite some time, and then developed lymphoma, and there weren't measurements being taken at the time of the amounts of carcinogens to which he was exposed. So this is necessary, a historical assessment is necessary, because this is a quote from Dr. Chiodo, and the details of exposure is not available. So a historical exposure assessment is required in a case like this, and it's standard. Extrapolation, the court held, is also generally accepted in a case like this to determine causation, quote, when the medical inquiry is new or the opportunities to examine a specific cause and effect relationship are limited. Well, Dr. Chiodo explained here that that's the case for the same reason as in Donaldson, because the only way to create a direct cause and effect study of someone developing lymphoma from these toxins would be to intentionally expose people to toxins, which wouldn't be ethical. And then, of course, there's a latency concern that there'd be a limitation because of the amount of time it takes someone to develop cancer from this. In a case like this, extrapolation is standard, and the court approved of it in Donaldson. All of the Railroad's challenges, therefore, go to the application of these generally accepted methodologies, not the methodologies themselves. They argue Dr. Perez, for example, should have personally visited the train yards, used other air quality data from them rather than the data he used, and then he misapplied a study called the Prunk Study. They argue Dr. Chiodo should have relied on more than just Dr. Perez's exposure report, that he should have done his own industrial hygiene report, that he should have personally examined Mr. Molitor in a medical examination, that he incorrectly performed his extrapolation, and he didn't sufficiently account for other possible causes. Those are challenges, as the courts have held time and time again to the application of methodologies, not the methodologies themselves. As the Supreme Court held in Donaldson, rejecting a Fry challenge for this very same reason, quote, questions concerning an expert's application of generally accepted techniques go to the weight of the evidence rather than its admissibility. The same is true here, and Fry, just as in Donaldson, is simply not implicated. The trial court erred in concluding otherwise. Finally, and importantly, the jury reasonably could rely on these experts' opinions to find the FELA standard of causation that the U.S. Supreme Court restated in the McBride case in 2011. Remember, this is an FELA case, and while that certainly doesn't change Fry or change the inquiry into generally accepted methodologies, it does change what causation is necessary. Unlike in a normal negligence case, there's no proximate cause inquiry. We don't have to show proximate cause. Instead, in McBride, the Supreme Court said that it's that the railroad's action likely played a part, no matter how small, in bringing about the plaintiff's injury, with no requirement that any fault be apportioned. Dr. Perez provided detailed testimony that Mr. Molitor suffered a chronic, substantial occupational exposure to carcinogens associated with the elevated risk of cancer. Then the railroad knew or should have known this, but failed to guard against it. That's negligence. And Dr. Chiodo provided detailed testimony that the exposures Dr. Perez identified were a likely cause of his injury, no matter how small, even if, as he allowed, there are other possible causes set out there, such as smoking. He said that still didn't change the fact that this remained a likely cause. These toxic exposures during this railroad work remained a likely cause of his injury. Your Honors, that's all the FELA requires. The expert's testimony was admissible, and the trial court erred in excluding it. This court should reverse the trial court's judgment and remand this case for trial. Questions? I have just one question, Mr. Sternberg. Thank you very much, and good morning, if it's still morning. Good morning. I'm in Kansas City, Missouri. Oh, good for you. Go Chiefs. We hope. Yeah, that's my team. The standard of review on summary judgment, we all know it's de novo, but when we're talking about the exclusion of testimony, witness testimony, is the standard of review altered by the fact that this took place in the context of summary judgment or that it took place in the context of a FELA claim? Good question. So I think it's important that it's in the context of summary judgment here. So in the Simons case, the Supreme Court of Illinois said that there's a dual standard. This is Simons from 2004, commitment to Simons. There's a dual standard for the exclusion of expert testimony. One is that whether the expert is qualified and whether the testimony is relevant to the case remains in the discretion of the court, but the Fry analysis is subject to de novo review. So if you go in West Lawn, you see a little red flag next to Donaldson, that's the red flag. It's that they changed the standard of review so that this question's always open. Now, I think summary judgment here is important because as to that first inquiry, we still have to view the facts in the light most favorable to Mr. Molitor. That's the Duran case from the second district a few years ago. So I don't think it's de novo. Go ahead. Sorry to interrupt. No problem. But was this really a Fry ruling? I mean, was this really about whether this was novel or new or was this more of just a garden variety? I don't think this evidence is sufficient to get to a jury even, which is a low standard. What's our standard of review? Fry rulings are de novo review, but if we don't think this was a Fry ruling, what is our standard of review on this evidentiary rule? Then at that point, it's strictly a summary judgment call. I agree with that. That summary judgment of course is de novo. Pardon the interruption. Let me challenge you on that. You can exclude witness testimony at any time. It usually takes place before a trial and it's usually a motion in limine brought by the other side and they could move for summary judgment after that happened, right? Certainly. What if there was no summary judgment here? What if they just moved to exclude this evidence, not based on Fry, but based on just a complete lack of foundation or reliability, what have you? What would be our standard of review then? It would be abusive discretion. But remember that when the court is making a ruling that as a matter of law, this foundation is insufficient or something like that, that's still de novo because if a trial court's decision rests on an error of law, then it's clear that an abusive discretion has occurred and it's always an abusive discretion to base a decision on an incorrect one. No, that's right. That would be your point. You would say the entire analysis, even if it were an abusive discretion standard, the entire analysis employed by Judge Roberts was just simply against what Donaldson holds and all of that? Correct. Yes, I would. I think NOC stands for that same proposition. For example, you mentioned foundation. If the trial court's ruling was that, well, this isn't Fry, although I think it was trying to imply Fry, that this foundation is simply insufficient, as a matter of law, that's not true. NOC points that out. I think regardless, at that point, it's still de novo because here, the true discretion is, is this relevant and is the expert qualified? Obviously, this court can review that too, but that's not what the trial court was ruling. It didn't say this was irrelevant or the expert wasn't qualified. It said that as a matter of law, there's no, there is insufficient foundation for this to be expert testimony. And it said that in the context of Fry citing Soto and those cases that are now. And you would say that was legal error regardless of the standard of review? Correct. I would. Yeah. Okay. Thank you. Any further questions? No, I have no questions. Thank you. David, you took all my questions away from me. I apologize, Justice Smith. No, you were right on though. That was okay. Appellee, you can go forward. Thank you, Your Honor. And still good morning, Your Honors. Karen DeGrand on behalf of the defendant, Appellee, BNSF Railway Company, may it please the court and counsel. The question before the court is whether either of plaintiff's two expert witnesses flunked the Fry test and based his conclusions on speculation. In the trial court and here on appeal, plaintiff does not dispute that he loses this appeal. If the trial judge correctly concluded that either Dr. Chiodo or Dr. Perez offered guesswork untethered to a generally accepted methodology of experts in their respective fields. I want to emphasize that point. Only one expert, the court need only agree with the trial court as to only one of the experts to reach the conclusion that summary judgment was correctly entered in this FLA case. Our position, of course, is that the trial court correctly recognized in line with Donaldson and subsequent decisions of the Supreme Court and of this court, that the testimony of these witnesses constituted a novel methodology and to correctly scrutinize the testimony and determine that neither expert, neither of them, employed a generally accepted methodology to reach his conclusions. So unless the court directs otherwise, I'm going to use my time to correct the plaintiff's respectfully some fundamental misstatements about the legal standard governing the motions below and to elaborate on the point that the record fully supports the trial court's conclusions regarding Dr. Chiodo's testimony. And then the court may go no further to affirm the entry of summary judgment. But if time permits, I'll also elaborate on our position concerning Dr. Perez, whose testimony also was correctly barred by the trial court. So as to the law, plaintiffs complained in his reply that the railroad's brief addressed the record in detail before fully demonstrating the ways in which the defense disagreed with plaintiff's legal analysis. Yes, your honors, guilty as charged, as far as our focus on the expert testimony and the fundamental problems with permitting a jury to hear opinions reached through a methodology best described as, because I say so. But to be clear on the law guiding this court's analysis, the body of governing law does not, as plaintiff claims, handcuff a trial judge at the summary judgment stage so that the trial judge, or yes, the trial judge must, and that's plaintiff's word, must accept an expert's rubber stamp of his methodology at the summary judgment stage. Plaintiffs cite Donaldson and Duren for this proposition. Neither case even comes close to supporting it. It's a bold misstatement of Illinois law, and it's the bedrock of plaintiff's appeal, your honors. Donaldson does not require or even authorize a trial court to accept that an ethics methodology is generally accepted merely because the expert says it is so. Rather, in explaining the appropriate Fry analysis and related issues, the Supreme Court observed that when proposing to identify a new causal link, an expert's basic methodology must exhibit a reliable basis, such as use of tissue samples, standardized or standard tests, patient examinations. That's the Donaldson opinion at page 86. Nor does Duren help the plaintiff rewrite Illinois law. The Duren court did not hold that a trial judge has no power to consider the basis for an expert's affidavit, as plaintiff argues. To the contrary, in explaining the court's ruling, Justice Thomas described that the court actually had delved into the factual basis for the expert's assertions. The Duren court actually reviewed the literature. Justice Thomas observed that 43 studies linked oral contraceptives, describing, and I quote, similar if not identical birth defects caused by medication containing the same hormone in the drug at issue. The appellate court determined that extrapolation under those circumstances, under those circumstances, was sufficiently established to be generally accepted in the community. As a trial judge observed in our case, what plaintiff proposes that a court must, must accept an expert's statement that his methodology is generally accepted defeats the very purpose of a Frye analysis. What plaintiff is advocating here, your honors, is that a paid expert becomes the sole decision maker of the admission of expert testimony. That's a pretty fundamental change in Illinois law. At that point, with this paid expert saying, yes, my methodology is generally accepted, without any elaboration, can then weigh the weight or determine what weight the opinion deserves. That's not what Donaldson said. And that's not how this court has viewed the admission of expert testimony before or after Donaldson. In plaintiff's opening brief, he floated another proposition that, frankly, is antithetical to consideration of expert witness testimony is strictly limited to methodology. Plaintiff claimed in the opening brief, foundation need not, should not, must not be considered by the trial judge. It always goes to the jury, cross-examination. That's wrong. As the Supreme Court tells us, and as the trial court explained in granting defendants motions, reliability is baked into the Frye analysis. That's the Nelson case, 235-02-386, quoting Donaldson. But plaintiff now, and also in his reply, conceded that the court does look at the foundation for an expert's testimony, grudgingly. In his reply, plaintiff acknowledged that a trial court looks broadly at whether an expert has a factual basis for his conclusions. But plaintiff says the data is off limits. That's not what Donaldson said. That's not, that is not what Duran says. Plaintiff frames the foundational inquiry as whether the record shows the absence of an articulable foundation. And that's not a standard that is borne out by the case law. It's merely another, because I said so, standard, or actually a non-standard. But plaintiff unwittingly provides an apt description of Dr. Chiodo's testimony, which lacks an articulable foundation. It is unless you just take his word for it. So on Dr. Chiodo, the medical causation expert, he indeed takes a novel approach subject to Frye scrutiny. Trial judge was right on that. As a trial judge observed, Chiodo employed a methodology that's on diesel exhaust, herbicide, and herbicides. His conclusion that they cause non-Hodgkin's lymphoma are generally accepted. So right off the bat, what's missing, and it's a fundamental absence from his testimony, is that his methodology is generally accepted. Not that his conclusions are. That's not, the conclusions aren't the Frye test. I think the closest he comes is to cite federal reference manual, but it does not generally corroborate Chiodo's association equals causation approach. His technique falls within the dubious validity range described in Donaldson, your honors, and that's Chiodo's unique methodology. He expressly ignores available scientific data. That's exactly what he says in his opinion. He identifies one source and maybe, or maybe a dozen, establish a causal connection, maybe merely an association. He avoids scientific data. In fact, rather than accounting for any negative studies that he might stumble across and looking for just one source, he shuts his eyes to them. Any scientific literature negative to his opinion and Dr. Chiodo's words is not relevant. And that's at pages 1460 and 1514 of the record on appeal. The plaintiff accuses in the reply, the defense of cherry picking. Talk about cherry picking. How can that methodology possibly pass muster? Only if the court accepts plaintiffs because he says so standard. Nothing in the record supports this methodology. Dr. Chiodo feared, I'm sorry. He cited a single study on the issue of diesel exhaust, a 208 Canadian study. I'm not going to even try to pronounce the name of the lead offer that starts with a K. So I'm going to call it the Canadian study. For his speculation that diesel exhaust exposure during plaintiff's years of working at BNSF caused plaintiff's illness. But that study, and he admits it does not state a causal connection exists between diesel exhaust experienced by railroad workers like plaintiff and B cell carcinoma. Dr. Chiodo admitted that the authors of the study concluded only then association, not a causal connection exists with respect to diesel exhaust and some occupations with the emphasis on farmers and machinists. In other words, he cited no study supporting his conclusion and he fared no better with respect to herbicide exposure. But I will submit that the court need not even address that issue because plaintiffs conceded the inadequacy of their industrial hygienist regarding exposure to herbicides. According to Dr. Chiodo, maybe association means causation, maybe it doesn't. And again, there's no support for this methodology, not even an attestation by him that that is an accepted methodology. He cites the reference manual on scientific evidence, which expressly questions whether association can actually demonstrate causation. As far as Dr. Chiodo, extrapolation. It is an error to say that the Donaldson case supports the notion that extrapolation is a generally accepted methodology. Donaldson does not say that. And as far as Dr. Chiodo offering an extrapolation theory, he offers no scientific basis for leaping from a connection of diesel exhaust to lung cancer to supporting the conclusion that diesel exhaust causes B-cell carcinoma. It's an entirely different disease. Mr. Molitor did not have lung cancer. As his doctors explained, the cancer was limited to his groin and his abdomen. It was not in his lung. It was not in his chest. And that's at page 3889 of the record on appeal. Chiodo doesn't even offer conclusory testimony that his extrapolation theory is generally accepted among medical experts. Instead, and he did this quite frequently during his deposition, your honors, he puts his lawyer hat on. He's also a lawyer, spends most of his time as a professional witness also and lectured defense counsel that Illinois law permits him to extrapolate. So rather than giving a scientific basis for this general that his extrapolation would be generally accepted, he cites the law and he cites the law incorrectly. The only way plaintiff can ask the court to reverse the order barring Dr. Chiodo is to create new legal standards that an expert willing to claim a conclusion is generally accepted or that his methodology is generally accepted, Dr. Chiodo didn't even say that, cannot be questioned at the summary judgment stage. There is no case in Illinois that says that. And a trial must confine any foundational scrutiny to whether the expert admits he cannot articulate a factual basis. The data is off limits. That is not accurate even by the Duran case that plaintiff relies on so extensively. It's not Illinois law. It should not be Illinois law. And the Noakes case, by the way, doesn't even involve a Frye analysis. Plaintiff cites it as though it does or argues it as though it does. In Noakes, the issue was a fairly unremarkable issue, which is whether a medical expert or rather a treating physician could testify as a medical expert. And this court said, yes, it could. And there was no Frye issue in that case. As to Dr. Perez, the trial court also correctly concluded that he failed to show that his methodology or the scientific principle on which he based his opinions, and that's the articulation of Frye in Rule 702, met with general acceptance in his field of industrial hygiene. The judge ruled that Perez fell short on all three topics of his testimony, exposure to diesel exhaust, exposure to herbicide, and whether the railroad had actual or constructive notice of an allegedly unreasonable workplace condition. But there's two threshold issues that I'd like to and that is plaintiff concedes that the circuit court was correct in the herbicide aspect of Dr. Perez ruling. He said Dr. Perez actually said nothing about estimated ranges of exposures and offered no scientific support for his conclusions. And that's articulated in his passing references in the statement, a fax of plaintiff's appellate brief, and a very passing reference at the end of plaintiff's reply, does plaintiff address the herbicide issue? So that issue is forfeited. More problematic for the plaintiff is there's no argument in the appellate brief about the railroad's actual or constructive knowledge and the railroad's conduct. So in the plaintiff in the reply said, well, that issue obviously is just sort of rolled into the question of Dr. Perez admissibility. But I don't see any provision in Rule 341 that allows a party to simply assume that his opponent and the court will fill in the gaps. The argument has to be presented. That omission by itself is enough, Your Honors, to sink Dr. Perez. As far as the points about Dr. Perez that plaintiff does address, the trial court reached the correct conclusion. His opinions are inherently unreliable, and the court also was correct in determining that Dr. Perez required a Frye analysis. He claimed he relied on literature and data provided by the railroads. But then Dr. Perez framed the established and established methodology as you have to actually go in and perform and assess the situation individually on its own merits and on its own details, which is what I do. But then here, he didn't do it. So to the contrary, his assessment was to accept plaintiff's self-serving testimony decades after the alleged exposure. We're talking Are you getting close to your conclusion? Your Honor, yes. I will just briefly say this. The emphasis on plaintiff's own testimony is justified or attempted to be justified by plaintiff with the citation to the Harbin case and another number of other cases that are set in the reply. But those cases do not do what plaintiff would like them to do. The Harbin case was so distinct from this case. It did not involve a situation where 30, 40 years after the fact, an individual was trying to give some anecdotal account, self-serving one at that, of exposures. And of all of these cases cited in his reply, they range from inapplicable PTSD diagnosis in a rape victim, to a plaintiff's statement, to a treating physician, followed by actual medical testing in the Malachowski case. But what these cases all have in common is that none rely on a plaintiff's self-serving statements to reject objective data. The objective data in the Prankstad study that Dr. Perez supposedly was using as his framework and the objective data provided by the railroad testing. So for all of those reasons, Your Honors, the railroad respectfully requests that the court affirmed the judgment of the trial court. Questions? With regard to Dr. Chioda, when you object to his methods, are you objecting to the fact that he relied on the report saying association as opposed to cause? Is that your objection? That's an objection, yes, Your Honor. It's speculation. It does not establish possession. Well, when I'm looking at this case, and here's what's going through my mind, it's almost everybody knows diesel fumes cause cancer. Everybody knows Roundup causes cancer. I mean, it's all in the news. It's all through the atmosphere. And there's laws passed to reduce diesel fumes and diesel smoke, because it's known the EPA and other countries, not just the USA, says that these fumes cause cancer. Now, given that, and Justice McMurrow issued a decision, I believe, which says we aren't limited to the record. We can take notice of what's out there. Given that, isn't it plausible that an article which, you know, given that everybody knows diesel causes cancer, isn't it plausible for him to rely on an article that says association as opposed to cause? I would say no, Your Honor. And doesn't that go to cross-examination as opposed to admissibility? No, Your Honor. I have to respectfully disagree with the court. From the standpoint of looking at what the plaintiff is arguing here, and as far as herbicides, there is, I have to take issue with the court's broad statement about this particular herbicide. And it's not just, it's not just a question of whether the, and there's any herbicide, whether there's any pesticide, is related to some kind of cancer. The question is whether the particular herbicide that was identified by the plaintiff, and the court will recall it's identified by the plaintiff by saying that he had seen bags of Roundup stored and had some very vague descriptions of what type of quote-unquote exposure was involved. But there is no scientific data that this particular herbicide causes cancer, causes B-cell carcinoma. So to the extent that there's, and to the extent that there is any recognized relationship between diesel exhaust and cancer, it's a different kind of cancer, not of this kind of cancer. So that's the, you know, the fact that there can be some relationship between a particular exposure to a particular alleged toxin, there has to be something much more specific than, well, now we know after 2012 that there is a relationship between diesel exhaust and lung cancer. Well, there's a giant leap then to say that there's a relationship between diesel exhaust and B-cell carcinoma in a railroad worker. But that doesn't go to method. That is not methodology. That's his opinion. It's not a novel, a new method. It's basically a conclusion that he comes up with that you disagree with because there's been no other scientific findings. But given that's the case, doesn't that, isn't that his opinion subject to cross-examination? This is not like there's some new test where, you know, he puts his finger in there and yeah, it comes and says it's long-term and that's what's caused it. This is not that kind of test. This is basically just an opinion of an expert who can be cross-examined and impeached. He certainly can be cross-examined and impeached, but I do disagree that it's not a methodology because what is his methodology? There has to be some way for him to get from point A to point B. And his way to get from point A to point B is to say, well, I think this causes cancer. And I think that extrapolation is allowed by Illinois case law. So I'm going to make that example. Extrapolation is not permitted based on something that is that tenuous. There has to be some reliability. There has to be some basis. So in the example that was given in Duran and cited in Donaldson was there has to be testing. There has to be some tissue samples. So to take that broad of a position, I would submit to the court, yes, it is a newer novel methodology because the methodology is I don't have to have a basis. I hope that answers the court's question. Anything further? I think the difficulty here is trying to find the line between methodology, criticizing the methodology versus criticizing the underlying conclusions. I mean, you clearly can't borrow witness just because you think their conclusions are flawed or based on a flimsy piece of data. Right. I mean, we could all agree on that or insufficient data. Maybe Mr. Sternberg can address this. What exactly was how would he describe the methodology here? But it seems like generally speaking, scientists testify about causation pretty routinely. There's nothing novel about finding that something causes something. He has found articles. I think there were a couple of articles that he thought to a 95 percent probability showed causation. Maybe that's wrong. Maybe you could cross him to death for it. But that's his methodology. And, you know, the lines are a little blurry here. But why isn't it OK for a scientist to base to look at a few articles and say, based on these, I think it is quite likely that he was his cancer was caused at least in part by this exposure. And then you can just say, well, your conclusions are Well, for one thing, your honor, I should say, I guess I'm sorry, Mr. Grant, I apologize for interrupting you. But no problem. What's new about that methodology is really the question. Right. Right. So there's a few questions there. I want to make sure I don't miss any of them. What is new about the methodology is he offers a conclusion that's just based on his own. This is what I think. And I don't care about any of the rest of the science. OK, I don't need I don't need an article that establishes causation. I don't need to take into account any other article that I come across that dispenses or contradicts or even wholly undercuts my position. That's a new and novel, certainly, because he doesn't even say that this is a framework that is generally accepted, a methodology that's generally accepted by physicians in this field that he, Dr. Chodol, likes to repeat that ninety five percent statistic, which is actually that's not that is a statistic. And I believe that in the hearing before Judge Roberts, this was addressed by both counsel. If that that is merely an articulation by the author of that study, that there is ninety five percent certainty that within the range of that article that they got their data correct. It's not you to take that and to say, well, ninety five percent of people who are exposed to diesel exhaust are going to have cancer. That's what Dr. Chodol was trying to sell. And that's just not accurate. That's not he cites. Am I correct that he had two peer reviewed articles that he relied on? He had two articles that he relied on. Correct. And so you take issue with those articles. I understand that. But I'm sure you can appreciate that we're trying to grapple with where these lines are, because because everything you're saying, Mr. Graham, sounds an awful lot like cross examination, right? A good cross examination, maybe, but a cross examination. I mean, what is novel about a doctor looking at peer reviewed studies and making a causation conclusion based on that? What's newer novel about that? What's newer novel is that there's no basis for the conclusion that there's no there's no causal link. There's no scientific conclusion that there is a with you here. My question is, what is I think the question is, maybe I'm wrong. Tell me if I'm wrong. What is newer novel about a scientist basing a causation determination on peer reviewed studies? Peer reviewed studies that reach a conclusion of causation would be one thing that would be a much I would have a much I'm not sure exactly how I would be arguing if that was what the you taking issue with how good the articles are. I mean, if he based it on a crystal ball, I think you know, we'd be with you. But his methodology has to be different than the strength or merit of his conclusions from that methodology. There's a point in the Donaldson case, your honor, does look at reliability, is that there is, yes, generally speaking, there's going to be a cross examining aspect to a problematic foundation. But this is tantamount to no foundation because it's speculation, because the articles do not reach the conclusion of causation. And that's what our position is. So that's why it's different, your honors. Thank you, Mr. Grant. Thank you. Jonathan, I guess you get to try and respond now. Sure. How much time do I have to respond? Curiosity? Five, six. We'll see how much you got to do this. This is this is heavy. Fair enough. I agree, Judge. If anyone's misreading the law, I think it's the appellee. Dr. Chiodo's opinion is not because I said so. Let me first start by their suggestion that our appeal hinges entirely on this notion that they had to take his statement and summary judgment as true. First of all, that is what Durand says. It's quite explicit. They noted that taking an expert's testimony as taking as true the affidavit, asserting that the extrapolation method is commonly used by the scientific community as well as various federal agencies, because this was a summary judgment. But unlike and I will stand on our reefs on that, because that is addressed as well in Donaldson. They were saying that there was after a trial and Durand was summary judgment. So that was a different posture. But they, I think, implicitly approved of that in Durand. Regardless, our appeal does not hinge on that. Both of the methodologies at issue, and Justice Ellis, I'll address your question about what was Dr. Chiodo's methodology. His methodology in using these opinion, these two, and there are two, peer-reviewed studies finding that this form of cancer, B-cell non-Hodgkin's resulted from, sorry, was associated with exposures to non-Hodgkin, sorry, exposures to diesel exhaust and agricultural pesticides, including glyphosate, which is the main ingredient in Roundup. He was able to extrapolate from that that there's causation. And I think it's just as how, as you pointed out, it's fairly well-known that these things cause cancer. He says that at the very beginning of his testimony. And he was using extrapolation, which he did, contrary to opposing counsel's statement. He absolutely did say that that is a generally accepted methodology. I'll point the court to pages 1525 to 26 of the record on appeal that I can fairly extrapolate general causation due to the known carcinogenity of diesel exhaust as propounded by the IARC from the World Health Organization. He doesn't have to say the word generally accepted methodology. He's clearly saying that it is, it's by the WHO and the IARC. So his methodology was extrapolation. Contrary to Appley's statement, extrapolation is absolutely well-established in Illinois law that it is a generally accepted methodology when you're dealing with these kinds of exposure cases. Donaldson does say that. While I agree, the extrapolation in Donaldson was for more studies than just this. I don't think that that is an attack, of course, on the application of his methodology, not the methodology itself. It's not a question of it being new or novel. They're saying he didn't do it right. And they have their own cross-examination, and I presume their own experts as well, who will testify to that so regardless of whether this is summary judgment or not, they did provide sufficient evidence that this was, that these are generally accepted methodologies. As far as foundation, I don't know how much clearer to make it that Fry, that Donaldson held a Fry plus reliability test is not the law of Illinois. While there are other cases, and they cite cases in which the word reliability is used, that's only just to determine whether there is a foundation at all. In Donaldson specifically, the court said that questions concerning underlying data go to the weight of the evidence rather than its admissibility. They said the so-called Fry plus reliability test didn't work, and they overruled prior case law, including cases on which the trial court here relied. As far as us conceding the herbicide question or conceding that Dr. Perez's opinion about the foreseeability and the railroad standard of care, the only reason the trial court rejected Dr. Perez is it said his foundation was insufficient. There isn't a separate holding about that. Our point is that that isn't the inquiry here, that all of Dr., it relied entirely on Dr., on this notion that Dr. Perez couldn't take the plaintiff's statements into account, and we would address that separately. It's all addressed at once. We absolutely have never conceded anything about the herbicides. Dr. Chiodo also testifies, obviously, about the herbicide exposure being a cause for lymphoma too. Additionally, it wasn't that Mr. Molitor had just seen some bags that said Roundup. He recalled a train going through the yard with a hose spraying herbicide from the top, and he recalled seeing that it said Roundup on the supply for that. The notion that especially in a case like this where you have these older exposures that took place a long time ago that the plaintiff's testimony can't be relied on, they simply have no law to support that. The case is on page 19 of our reply brief, which I agree they're all in different circumstances, but the point is if what you have is the plaintiff's statements about what they experienced, the expert can take that as true. Obviously, opposing counsel can cross-examine the expert and say, well, aren't you just relying on the plaintiff's testimony? Of course, they would say yes. That goes to weight and not admissibility. They have no case law that says anything other than that. I'll close with this. What the appellee is really asking for is a time machine rule. Their argument is that unless we can go back in time and take specific measurements of the amounts of glyphosate and diesel exhaust that Mr. Molitor experienced 40 years ago and then have a specific study that directly says that amount causes this specific kind of cancer, no plaintiff in this circumstance could ever have recovery under the law of Illinois. That is not the law of Illinois for all the reasons that we've addressed. Thank you both. Does anybody have any questions? No, I don't. Okay. Again, I wish to thank you both. I don't know how much time you guys spent preparing for this. If I prepared for this case the way you guys did, it would probably take me a month. I really appreciate your in-depth preparation. Thank you again very much.